Filed 10/29/21 In re Monica R. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re Monica R., et al., Persons Coming Under Juvenile Court Law.<br><br>_____<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>E.R.,<br><br>     Defendant and Appellant. | B311061<br><br>(Los Angeles County Super. Ct. No. 18CCJP08147)<br><br><br>**ORDER MODIFYING OPINION**<br><br>**[There is no change in judgment.]** |

BY THE COURT:

It is ordered that the opinion filed herein on October 28, 2021, is modified as follows:

On the caption page, delete case number 18CJJP08147 and replace it with 18CCJP08147.

There is no change in judgment.

_____

RUBIN, P. J.          BAKER, J.          KIM, J.

Filed 10/28/21 In re Monica R. CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Monica R., et al., Persons Coming Under Juvenile Court Law. | B311061 |
| _____ | (Los Angeles County Super. Ct. No. 18CJJP08147) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| E.R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge. Affirmed in part, reversed in part, and remanded.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother appeals from the juvenile court's order terminating her parental rights over her nine-year-old daughter. When daughter was seven years old, the Department of Children and Family Services (Department) removed her from mother's custody due to severely unsanitary conditions in the family home. During the ensuing two years, mother visited and called daughter in her foster home, and daughter said she wanted to return to mother's care.

At the selection and implementation hearing, mother's counsel asked the juvenile court to order a bonding study and hold a contested hearing to permit mother to prove the parental-benefit exception to the termination of parental rights.[1] The trial court denied these requests, reasoning a bonding study was unnecessary because "mere visitation" is insufficient to trigger this exception.

Although a juvenile court is afforded considerable discretion in deciding whether to grant a bonding study, it was an abuse of discretion to refuse to order the requested study on the state of the record before the juvenile court—which was notably lacking much information about the relationship between mother and daughter. As a recent Supreme Court case explains, such a study was accordingly necessary to permit the juvenile court to evaluate the complexities of a ruling on the parental-benefit exception. (*In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).) We shall therefore reverse the parental rights termination order as

---

[1] We use the phrases "parental-benefit exception" and "parental bond exception" as labels for the exception currently codified at Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).

to daughter with directions to order the requested bonding study and thereafter redetermine the question of whether adoption, guardianship, or some other resolution is most appropriate for the dependency proceedings commenced because of a filthy home.

### *FACTUAL AND PROCEDURAL BACKGROUND*

In December 2018, the Department detained daughter, then seven years old, and her younger brothers (ages three years old and one month) from their parents' care due to severely unsanitary conditions in their home. Daughter told the social worker mother cared for her, provided her clean clothes, and cooked her meals. However, the social worker documented repeated instances of health hazards in the home. In January 2019, the court declared the children dependents, and removed them from their parents' custody. The children were all placed with the same foster family. The court ordered reunification services for the parents and monitored visitation. Mother appealed, and we affirmed the court's orders. (See *In re M.R.* (Sept. 27, 2019, B295466) [nonpub. opn.].)[2]

In September 2019, the juvenile court held a six-month review hearing. The Department reported the parents had had "sporadic visitation with the children," however, mother called daughter every day, and daughter, now eight years old, said she wanted to return to mother's care. The court ordered the Department to provide additional reunification services.

For the next six months, mother proceeded to consistently attend weekly visits with the children and call them daily. In March 2020, mother stopped in-person visits due to concerns about COVID-19. Mother continued to maintain contact with the

---

[2] We described the filthy and unsanitary conditions in detail in our prior opinion.

children daily either by phone or "video chat." In August 2020, the Department reported that daughter was building "a healthy appropriate relationship with foster mother" but still missed mother and wanted to return to her care. Foster mother monitored the children's calls with mother and "reported no major concerns with mother." Mother "did her best to try to engage with the children but it was challenging at times to maintain" the attention of the now five-year-old and one-year-old.

In October 2020, the court held a review hearing, and terminated reunification services. The juvenile court set a "permanency planning review hearing" under Welfare and Institutions Code section 366.26.[3] Over the months leading up the section 366.26 hearing, mother continued to call or video chat with the children daily. During these visits or calls, mother "focuse[d] more on" daughter than the younger children, and "mainly" spoke to daughter as the five-year-old was "unable to stay on the phone." Mother was "appropriate during video or telephone calls, as she ask[ed] the children about their day and ma[de] conversation about what she does at home."

The Department recommended termination of parental rights and adoption by the children's foster parents who had expressed a willingness to adopt. While daughter reported feeling "happy and safe in the home" of her caregivers, she continued to express a desire to return to her mother's care.

In February 2021, the court held a selection and implementation hearing. At the hearing, mother's counsel asked the court to order a bonding study and hold a contested hearing "under the parental bond exception." Minor's counsel, who

---

[3] All undesignated statutory references are to the Welfare and Institutions Code.

4

represented all three children, argued only, "I would oppose setting this for a contest on the parental bond exception and point out that although mother had had regular visits, she hasn't had a parental role with the children, which would be required to sustain the parental bond exception." The court agreed on the ground, "Mere visitation with the children is not enough to trigger the parental bond exception."

Neither counsel nor the court addressed the children's individual relationships with mother or any specific facts in the record. The juvenile court concluded generally that mother could not establish an exception to the termination of parental rights as to any of her children, terminated parental rights, and ordered adoption as the permanent plan. Mother timely appealed. She challenges on appeal only the court's orders as to daughter.

## *DISCUSSION*

### 1. *The Parental-Benefit Exception and Bonding Studies*

At a selection and implementation hearing, the juvenile court "must sift through often complicated facts to weigh competing benefits and dangers for the child. It must consider practical realities over which it has limited control and envision a child's future under contingent conditions. And it must navigate situations that can change as quickly as the children before the court do.

'To ease the court's difficult task in making this important decision, the statute provides a carefully calibrated process. Even if a court finds by clear and convincing evidence that the child is likely to be adopted, the parent may avoid termination of parental rights by establishing at least one of a series of enumerated exceptions. If the parent establishes that an exception applies, the statute sets out additional steps for

5

selecting a permanent plan for the child that preserves parental rights.  Going step by step through the prescribed process, the court can somewhat more easily accomplish the statutory goals of protecting the parent and child from an overhasty termination of their relationship while ensuring that the child is expeditiously placed in a safe and stable home." (*Caden C.*, *supra*, 11 Cal.5th at p. 625.)

When a parent seeks to establish the parental-benefit exception, she must show that "the parent-child relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; *Caden C.*, *supra*, 11 Cal.5th at p. 634.) The legal test is straightforward.  A parent must prove, by a preponderance of the evidence, that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child.  (See § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.)  "The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

"The first element — regular visitation and contact — is straightforward. . . .  As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)  Again here, the focus is the child.  And the relationship may be shaped by a slew of

6

factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' . . . [O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633.)

"Concerning the third element — whether 'termination would be detrimental to the child due to' the relationship — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) . . . What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

"That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship

7

with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. (§ 366.26, subd. (c)(1)(B)(i), italics added.)" (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

"What's more, understanding the harm associated with severing the relationship is a subtle enterprise — sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

"In attempting to establish or eliminate this exception to the preference for adoption, the parties or the court may require a bonding study to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored." (*In re S.R.* (2009) 173 Cal.App.4th 864, 869.) "Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4.)

## 2. *Standard of Review*

We review the court's decision to deny a bonding study for abuse of discretion or "whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341.)

## 3. *Remand is Necessary for the Juvenile Court to Order a Bonding Study*

Here, the juvenile court declined to order a bonding study apparently believing mother could not prove the parental-benefit relationship exception even with a bonding study.[4] The record does not support that view.

---

[4] The dissent correctly observes that, at the selection and implementation hearing, the juvenile court stated that parents have "not maintained regular visitation with the children." The transcript also reflects that children's counsel, who opposed the bonding study, acknowledged at the hearing that "mother has had regular visitation visits." Children's counsel's argument was that, regular visits aside, mother "hasn't had a parental role with the children that would be required to sustain the parental role exception." Counsel's point was that, even with regular visitation, mother had not satisfied the second and third elements of the statute. (§ 326.26, subd. (c)(1)(B)(i).) Mother's counsel and children's counsel then discussed mother's visitation, especially during the pandemic. The juvenile court responded, consistent with the statute, "It is the position of the court that the mere visitation with the children is not enough to trigger the parental bond exception." Shortly thereafter, the court made the finding quoted in the dissent. On this state of the record, with the focus on the parental role and a requested bonding study, we conclude the trial court denied the request for those reasons, not for irregular visitation.

The juvenile court made its decision before *Caden C.* was decided. The juvenile court, thus, was not in a position to consider either (1) the Supreme Court's underscoring of the complexities of assessing the parental-benefit relationship and the detriment to the child; or (2) the Court's suggestion that juvenile courts "should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4.) Even when considered on the state of the law before *Caden C.*—and certainly on the state of the law after that decision—a bonding study as to daughter was necessary because applicability of the parent-child relationship exception was far from an open and shut case.

The record before the juvenile court concerning the extent of mother and daughter's relationship was rather sparse. Daughter lived with her parents until she was seven years old, and the court removed daughter due to unsanitary conditions in the home. There was no evidence mother mistreated daughter; instead, daughter told the social worker mother cared for her, provided her clean clothes, and cooked her meals. Nor was there evidence of substance abuse, domestic violence or other similar issues that regularly reach the juvenile courts. Although mother initially visited daughter "sporadically," after the first few months of removal, mother's visitation then became consistent: she had weekly visits with daughter until the COVID-19 outbreak, at which point mother regularly visited with daughter every other day through video chat and spoke with daughter on the phone the other days.

No evidence suggested mother's visits with daughter had a negative impact on her. Instead, mother was reported to be

10

appropriate during her contact with daughter, and during the two years daughter lived with her foster parents prior to the selection and implementation hearing, daughter did not waver from her desire to return to mother's care.[5]

This was the sum of the evidence about mother and daughter's relationship, none of which included any observations, by experts or others, on the parent-child bond. There was, of course, the filthy home that was what prompted dependency proceedings in the first place, but that says nothing about the quality of the relationship between mother and daughter and whether daughter would be greatly harmed by severing it. Indeed, perhaps the best evidence on that score was daughter's steadfast desire to return to mother's care. On the state of the evidence, mother should have had the opportunity to reinforce by expert evidence what in several respects was apparent: termination of parental rights is too severe a sanction.

The point is well illustrated by *Caden C.* In that case, the dependent child had lived with his mother until he was four years old and was similarly "distressed at the prospect of not living with his mother," "[n]umerous witnesses described how they'd observed the relationship" over a four-day section 366.26 hearing. (*Caden C., supra*, 11 Cal.5th at p. 627.) Mother's expert provided a bonding study and testified the child had "an intense bond with" his mother such that "losing contact with [her] would compound [the child's] other traumas . . . ." (*Ibid.*) The child protection agency also put on an expert in parent-child bonding

---

[5] Our review of the reporter's transcript reveals that, at the selection and implementation hearing, neither the court nor counsel gave significant attention to daughter's relationship with her mother.

who testified the child had a " 'very strong emotional bond with his mother,' " but opined " 'the narrowness of the bond poses a risk to [the child's] ability to devote his attention, energy, investment to developmentally appropriate tasks now of learning [and] socialization.' " (*Ibid.*)

The record established in *Caden C.* allowed for the "subtle, case-specific inquiry" required by the parental bond exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) That could not happen here without additional information in the record. As we have already highlighted, daughter was removed from her parents after living together for many years, mother consistently maintained contact with the child for over a year before the selection and implementation hearing, daughter's contact with the parent was reported to only be appropriate and there was no evidence the visits had a negative effect on the child, and daughter consistently expressed a desire to return to her parent's care. As our Supreme Court has now rather strongly signaled, this is the type of scenario where a bonding study would provide necessary illumination of the complex question of detriment to the child caused by the termination of parental rights.

Finally, we address the Department's argument that mother's request for a bonding study came too late in the proceedings, citing to *In re Richard C.* (1999) 68 Cal.App.4th 1191. In that case, the court held that a request for a bonding study made just prior to a section 366.26 hearing "came too late in the proceedings to be a necessary part of the court's efforts to develop a permanent plan for the children." (*Id.* at p. 1197.) The court explained: "The Legislature did not contemplate such last-minute efforts to put off permanent placement. [Citation.] While it is not beyond the juvenile court's discretion to order a bonding

12

study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes . . . ." (*Id.* at p. 1197.)

We agree that late-filed requests for a bonding study should be discouraged. Here, mother's request would have required the juvenile court to continue the section 366.26 hearing, causing significant delay at a critical stage of the proceedings. The Legislature and our Supreme Court have repeatedly indicated the importance of avoiding "unnecessary delay in providing permanency for children" in dependency proceedings. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) In our view, a last-minute request for a bonding study should be granted rarely. But *Caden C.*'s emphasis on the difficulty of determining the parental-benefit exception and its call for serious consideration of such studies counsels against treating untimeliness as a talisman for denial.[6]

### *DISPOSITION*

The order terminating parental rights over daughter Monica R. is reversed and the cause is remanded with directions to order the bonding study requested by counsel for mother and thereafter hold a new section 366.26 hearing as to Monica R. In

---

[6] Our resolution of this issue makes it unnecessary to consider whether mother's attorney provided ineffective assistance of counsel by not earlier requesting a bonding study.

13

all other respects, i.e., as to the younger brothers, the juvenile court's parental rights termination order is affirmed.


                                    RUBIN, P. J.

I CONCUR:


            BAKER, J.

In re M.R. et al. /
Department of Children and Family Services v. E.R.
B311061


KIM, J., Dissenting


I respectfully dissent.

This case does not raise the issue decided by the majority, that is, whether a limited remand is appropriate when a juvenile court finds that a parent has maintained consistent visitation but nonetheless declines to order a bonding study. Here, the court, in terminating mother's parental rights, found that "each of these parents has not maintained regular visitation with the children, and [it did] not believe that a bond with these children has been established sufficient to trigger the parental bond exception." Mother does not challenge the sufficiency of the evidence supporting the court's finding that the first element of the parental benefit exception did not apply. Absent a finding that the court's ruling was without substantial evidence, I think it inappropriate to remand this matter to the juvenile court to reconsider whether to order a bonding report. Such a report may be relevant to the second and third elements of the parental benefit exception, "whether 'the child would benefit from continuing the relationship'" and "whether 'termination would be detrimental to the child due to' the relationship" but has no

1

relevance to the first element, which our Supreme Court observed "is straightforward.  The question is just whether 'parents visit consistently[.]'"  (*In re Caden C.* (2021) 11 Cal.5th 614, 632–633.)



KIM, J.


2